**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

---

| | | |
|---|---|---|
| **DALE MONROE, and** | ) | |
| **AMANDA DABBS, individually and** | ) | |
| **as next friend of C.B.D. and M.D.D.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 07-1055-STA-egb** |
| | ) | |
| **MCNAIRY COUNTY,** | ) | |
| **TENNESSEE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS MCNAIRY
COUNTY, TENNESSEE; RICKY ROTEN; SCOTT HEATHCOCK; ALLEN
STRICKLAND, AND DUSTIN BROWN'S MOTION FOR SUMMARY JUDGMENT;
ORDER GRANTING IN PART, DENYING IN PART PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT;
ORDER GRANTING DEFENDANT ROBERT COREY DABBS'
MOTION FOR SUMMARY JUDGMENT**

---

Before the Court are Defendants McNairy County, Tennessee; Ricky Roten; Scott Heathcock;

Allen Strickland; and Dustin Brown's (hereinafter "Defendants") Motion for Summary Judgment

(D.E. # 123) filed on April 29, 2011. Plaintiffs Dale Monroe and Amanda Dabbs, individually and

as next friend of C.B.D. and M.D.D., have responded in opposition to Defendants' Motion (D.E. #

135), to which Defendants have filed a reply (D.E. # 137). Plaintiffs filed their own Motion for

Summary Judgment (D.E. # 124) on April 30, 2011. Defendants have responded in opposition (D.E.

# 130) to Plaintiffs' Motion, and Defendant Robert Corey Dabbs has filed a separate response in

opposition (D.E. # 134). Finally, Defendant Robert Corey Dabbs filed a Motion for Summary

Judgment (D.E. # 127) on May 1, 2011, to which the other Defendants have responded (D.E. # 131) as well as Plaintiffs (D.E. # 136). This matter was reassigned to the undersigned for all further proceedings on December 30, 2011. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED IN PART, DENIED IN PART**. Plaintiffs' Motion for Summary Judgement is **GRANTED IN PART, DENIED IN PART**. Defendant Dabbs' Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

Plaintiffs Dale Monroe and Amanda Dabbs, individually and as next of friend of her minor children C.B.D. and M.D.D., filed this 42 U.S.C. § 1983 action alleging that Defendants McNairy County, Tennessee; Sheriff Ricky Roten; Deputy Scott Heathcock; and Deputy Dustin Brown [1] violated their constitutional rights as well as the Federal Kidnapping Act, 18 U.S.C. § 1201, et seq., and various state laws.[2] The case arises from the McNairy County Sheriffs Department's involvement in a child custody dispute between Plaintiff Amanda Dabbs and her estranged husband Defendant Robert Corey Dabbs. Ms. Dabbs, her minor children, C.B.D. and M.D.D., and her father Plaintiff Dale Monroe allege that the Defendants engaged in a pattern of harassment that violated their constitutional rights.

---

[1] Defendant Allen Strickland was dismissed by stipulation of all the parties on April 29, 2011 (D.E. # 122).

[2] The Court has previously granted summary judgment in favor of the Defendants as to the Plaintiffs' Fifth and Fourteenth Amendment claims. *See* Order Granting in Part, Denying in Part Defendants' Motion for Summary Judgment, 7-8 Aug. 5, 2008 (D.E. # 85). As a result only Plaintiffs Fourth Amendment claims remain.

Unless otherwise noted the following facts are not in dispute for purposes of the parties'

Motions for Summary Judgment. Bobby and Amanda Dabbs separated in November 2005 after Ms.

Dabbs learned that her husband was engaging in an extra-marital affair with Melanie Pettigrew

("Pettigrew").[3]  In January 2006, Mr. Dabbs filed a complaint for divorce in the McNairy County

General Sessions Court.  That court issued a temporary parenting plan on January 20, 2006, ordering

that the children were to reside with Bobby and Amanda Dabbs according to the following schedule:

> During the first week, the minor children shall reside with the Mother
> on Monday, Tuesday, Saturday, and Sunday, and shall reside with the
> Father on Wednesday, Thursday and Friday.  During the second
> week, the minor children shall reside with the Father on Monday,
> Tuesday, Saturday, and Sunday, and with the Mother on Wednesday,
> Thursday and Friday.  The Parties will alternate each week thereafter
> until a Permanent Parenting Plan shall be put into effect.

(Ex. to Heathcock Aff., D.E. # 123-10.)  Ms. Dabbs contends that she did not receive a copy of the

temporary parenting plan until months after it was issued.

During the pendency of their divorce, the Dabbs encountered a number of disagreements over

their respective child custody and visitation rights.  Bobby Dabbs alleged that many times his wife

failed to transfer their children to his custody according to the terms of the temporary parenting plan.

According to Defendants, Mr. Dabbs filed a report with the McNairy County Sheriffs Department

on ten occasions in 2006 in order to document the missed exchanges.

Mr. Dabbs made one such report on March 18, 2006.  Deputy Scott Heathcock, who

responded to the report, called Ms. Dabbs' cell phone and left her a voicemail.  When she called him

back, Deputy Heathcock allegedly told Ms. Dabbs that she was not following the temporary

---

[3] Pettigrew was dismissed as a defendant in this matter by stipulation of all the parties on April 29, 2011 (D.E. # 121).

parenting plan established by the court and advised her to comply in the future. Ms. Dabbs admits that she was aware of the parenting plan by late March 2006 because her attorney filed a motion to modify it on March 24, 2006. However, she insists that her husband had also failed to follow the plan and had requested multiple deviations from its schedule.

On April 19, 2006, at 9:40 a.m., Mr. Dabbs again went to the McNairy County Justice Complex to report that Ms. Dabbs was not allowing him to see their children under the terms of the parenting plan (D.E. # 69-2). Some time later that day, Ms. Dabbs was allegedly confronted by her husband and a McNairy County deputy sheriff that she thought was Allen Strickland.[4] Ms. Dabbs was driving on Highway 45 with C.B.D. and M.D.D. in the back seat when she pulled into a private driveway to turn around. Before she could back out of the driveway, the deputy sheriff parked his patrol car behind her, blocking her in the driveway. Mr. Dabbs then pulled behind the patrol car in a van. Ms. Dabbs rolled down her window and spoke with the deputy sheriff. The officer stated that they had been looking for her all over the county and asked if she would give the children to her husband. When Ms. Dabbs refused, the deputy sheriff purportedly told her that Mr. Dabbs "has papers saying that he's supposed to have them." Ms. Dabbs testified that her husband and the officer then stood outside talking for a while, and she rolled her window up. The two men then departed without attempting to take the children. According to Ms. Dabbs, the encounter lasted

---

[4] In her deposition, Amanda Dabbs stated that she thought the officer was Allen Strickland but admitted that she was not sure. As previously noted, the parties have since stipulated to the dismissal of Strickland as a Defendant in this case. In their response to the Plaintiffs' motion, Defendants concede that the officer involved in the April 19, 2006 incident was actually Deputy Bradley Smith. However, Smith is not a named Defendant in this case, and Plaintiffs have never sought leave to add him as a party.

approximately five to ten minutes. Mr. Dabbs stated that he had no recollection of the events of April 19, 2006.

On May 27, 2006, Mr. Dabbs filed another report with the McNairy County Sheriffs Department, alleging that Ms. Dabbs had failed to show up to exchange their children as required by the parenting plan. Deputy Heathcock accompanied Mr. Dabbs to the Dabbs' residence. According to Ms. Dabbs, Deputy Heathcock pulled his patrol car into her circular driveway while Mr. Dabbs remained in a vehicle by the mailbox. Deputy Heathcock knocked on the front door and asked that she come to the door but Ms. Dabbs refused. Ms. Dabbs testified that Deputy Heathcock knocked on her door for approximately ten minutes and then looked in the house's windows when she did not answer. Ms. Dabbs also stated that while Deputy Heathcock was knocking, she received a telephone call from Darlene Reeves who said that her husband had heard on the radio a warrant was out for Ms. Dabbs' arrest. However, Deputy Heathcock never announced to Dabbs that he had a warrant for her arrest, and he left the residence after she did not come to the door.

On May 31, 2006, Mr. Dabbs again went to the McNairy County Sheriffs Department to report that his wife did not make the scheduled exchange of their minor children. Mr. Dabbs met with Sheriff Roten and Deputy Heathcock at which time Heathcock prepared an incident report. According to Deputy Heathcock, Sheriff Roten also directed him to prepare an arrest warrant for Ms. Dabbs charging her with the offense of custodial interference and to go to Ms. Dabbs' residence to see if she would allow Mr. Dabbs to have the children. Deputy Heathcock thereafter drove to the Dabbs home, with Mr. Dabbs following in a separate vehicle. Upon arriving at the home, Mr. Dabbs stayed on the street while Heathcock went to the door. According to Ms. Dabbs, Deputy Heathcock knocked on the door and announced that he had a warrant for her arrest and that he was there to take

the children. Deputy Heathcock states that he simply knocked on the door, rang the doorbell, and asked that she come to the door to speak with him. He testified that he could hear the television on inside and thought he heard someone run through home. However, when no one came to the door, Deputy Heathcock walked away and told Mr. Dabbs that no one was home.

Deputy Heathcock testified that as he was preparing to leave the Dabbs residence on May 31, 2006, Selmer Chief of Police Neil Burks, who lives on the same street as Ms. Dabbs, pulled up.[5] According to Heathcock, Chief Burks informed him that often after law enforcement attempted to obtain the children from Ms. Dabbs, her father Dale Monroe would arrive at the Dabbs' residence to pick up Ms. Dabbs and the children. Chief Burks allegedly told Heathcock that Ms. Dabbs would duck down in Monroe's vehicle to avoid detection as they drove away. Deputy Heathcock also stated that Chief Burks gave him a description of Monroe's truck.

When Deputy Heathcock left the residence on May 31, 2006, Ms. Dabbs called her father to come for C.B.D. and M.D.D. so that Ms. Dabbs could go to work. Ms. Dabbs testified that she left her residence and drove to the Bancorp South building in Selmer, Tennessee, where she was scheduled to clean. Upon her arrival at work, Michael Gilbert of the Selmer Police Department pulled up in an unmarked, white SUV.[6] Officer Gilbert stopped her, confirmed her identity, and asked if she was aware of the warrant for her arrest. (Amanda Dabbs Dep. 179:11–24, Apr. 1, 2009,

---

[5] The Plaintiffs dispute this fact because Burks has denied speaking with Deputy Heathcock or any other law enforcement officer about the Dabbs situation. (Burks Dep. 18:11–19:3, 27:19–28:24, Aug. 18, 2010.)

[6] The Court previously granted summary judgment in favor of Gilbert and the City of Selmer, Tennessee. *See* Order Granting Mot. Summ. J. Defs. City of Selmer & Michael Gilbert, Nov. 6, 2007 (J. Todd) (D.E. # 51).

D.E. # 126-3). When Ms. Dabbs replied that she did not know about the warrant, Gilbert allegedly responded, "Well, wait right here. I'll go check with Scotty." (*Id.*) According to Ms. Dabbs, Officer Gilbert placed a phone call, which she presumed was to Deputy Heathcock, and came back and told her that she was free to go.

In the mean time, Deputy Heathcock acted on Chief Burks' tip and set up surveillance outside of the Dabbs' neighborhood to see if Monroe would come to the home as Burks reported. Deputy Heathcock called in to speak with Chief Deputy A.C. Felker and advised Felker that he had a warrant for Ms. Dabbs' arrest. Deputy Heathcock explained the tip from Burks and told Chief Deputy Felker that he was going to try and pick up Ms. Dabbs on the warrant if she was in Monroe's vehicle. After waiting for some time, Deputy Heathcock observed a truck matching Chief Burks' description of Monroe's truck and driving from the direction of Dabbs' street. As Deputy Heathcock followed the truck on Highway 45, he ran its tags and then called on the radio to advise Chief Deputy Felker that he intended to stop the truck and determine whether Amanda Dabbs was inside. Deputy Heathcock then activated his blue lights and stopped the vehicle. Heathcock observed that Monroe was driving and C.B.D. and M.D.D. were in the truck with him. However, Ms. Dabbs was not in the vehicle. Deputy Heathcock asked Monroe to exit and to come to the rear of the vehicle because he did not want to say anything in front of the children. Deputy Heathcock testified that he then told Monroe that he had an arrest warrant for Ms. Dabbs and that if he arrested her, the children would go with Mr. Dabbs who was waiting just up the street.

While Deputy Heathcock was talking with Monroe, Chief Deputy Felker, Deputy Kim Jordan f/k/a Kim Hurley, and Deputy Bobby Crumby arrived at the scene of the stop.[7]  Chief Deputy Felker began talking with Monroe while Heathcock called Sheriff Roten on his cell phone.  According to Heathcock, Sheriff Roten advised him to ask Monroe if he had "grandparent rights" and if not, to take the children and give them to Bobby Dabbs.  When Monroe responded that he had no custodial rights, Deputy Heathcock told him that they were going to take the children to their father.  Over Monroe's objections, the children were removed from the truck and placed in Chief Deputy Felker's patrol car.  Monroe was free to go and left the scene.  After Monroe departed, Mr. Dabbs drove to the location of the stop where the officers transferred the children to his custody.

The last encounter at issue between the parties occurred on September 18, 2006.  Amanda Dabbs and Bobby Dabbs met in the parking lot of the McNairy County Justice Complex for a prearranged transfer of M.D.D.  Mr. Dabbs arrived to take custody of the child with his girlfriend Melanie Pettigrew.  After Ms. Dabbs refused to complete the exchange because of Pettigrew's presence, she parked her vehicle at the end of the parking lot and called her attorney.

At the same time, Deputy Dustin Brown observed Pettigrew in the parking lot and served her with a subpoena.  According to Deputy Brown, Mr. Dabbs was visibly upset and expressed frustration that his former wife had refused to exchange their child.  Mr. Dabbs asked Deputy Brown to approach Ms. Dabbs and tell her that Mr. Dabbs and Pettigrew had married and ask if she would allow him to have M.D.D.  Deputy Brown drove to the end of the justice complex driveway to

---

[7] In a prior order, the Court determined that Chief Deputy Felker, Deputy Jordan, and Deputy Crumby were entitled to qualified immunity and granted summary judgment in their favor.  *See* Order Granting in Part, Denying in Part Defendants' Motion for Summary Judgment, Aug. 5, 2008 (D.E. # 85).

contact Ms. Dabbs.  At that point Ms. Dabbs was still on the phone and subsequently informed

Deputy Brown that on the advice of her attorney she did not have to transfer M.D.D. to her husband.

She also told Deputy Brown that Mr. Dabbs and Pettigrew could not be married because the divorce

was not yet final.  Ms. Dabbs was then free to leave the parking lot.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment

if the moving part "shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.[8]  In reviewing a motion for summary judgment, the evidence

must be viewed in the light most favorable to the nonmoving party.[9]  When the motion is supported

by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his

pleadings but, rather, must present some "specific facts showing that there is a genuine issue for

trial."[10]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material

facts."[11]  These facts must be more than a scintilla of evidence and must meet the standard of

whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party

is entitled to a verdict.[12]  When determining if summary judgment is appropriate, the Court should

ask "whether the evidence presents a sufficient disagreement to require submission to a jury or

---

[8] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[10] *Celotex*, 477 U.S. at 324.

[11] *Matsushita*, 475 U.S. at 586.

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

whether it is so one-side that one party must prevail as a matter of law."[13]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[14]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[15]  Finally, the "judge may not make credibility determinations or weigh the evidence."[16]  Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[17]

## ANALYSIS

### I.  Plaintiffs' Motion to Strike Defendant Dabbs' Motion for Summary Judgment

As an initial matter, the Court must consider Plaintiffs' Motion to Strike Defendant Robert Dabbs' Motion for Summary Judgment.  The Court's deadline for filing dispositive motions in this case was April 30, 2011.[18]  Defendant Dabbs filed his Motion for Summary Judgment on May 1, 2011, thereby missing the deadline by one day.  Plaintiffs urge the Court to deny or strike Defendant's Motion as untimely.  It is within the Court's discretion to consider an untimely filed

---

[13] *Id.* at 251-52.

[14] *Celotex*, 477 U.S. at 322.

[15] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[16] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[17] Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322.

[18] D.E. # 117.

motion for summary judgment.[19]  In this case Defendant's Motion was merely one day late.  The Court finds that Plaintiffs had adequate opportunity to respond and that Defendant's late filing has not delayed the trial of this matter.  As a result, the Court finds that the administration of justice will be served by reaching the merits of Defendant's motion.  Therefore, Plaintiffs' Motion to Strike is **DENIED**.

## II.  Section 1983 Claims Against Defendants in Their Individual Capacities

Title 42 U.S.C. § 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."[20]  "Section 1983 serves as a vehicle to obtain damages caused by persons acting under color of state law whose conduct violates the U.S. Constitution or federal laws."[21]  Section 1983 "is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."[22]  To prevail on their claims, the Plaintiffs must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law."[23]

Government officials, including police officers, are immune from civil liability unless, in the

---

[19] *E.g. Thomas v. Harvey*, 381 F. App'x 542 (6th Cir. 2010) (district court did not abuse discretion by considering amended summary judgment motion that was four days late).

[20] 42 U.S.C. § 1983.

[21] *Waeschle v. Dragovic*, 576 F.3d 539, 543 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 2063 (2010).

[22] *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

[23] *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

course of performing their discretionary functions, they violate a plaintiff's clearly established constitutional rights.[24]   In other words, a "defendant enjoys qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established."[25]  The defense of qualified immunity "ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were [ ]lawful."[26]  When qualified immunity is asserted, the plaintiff bears the burden of showing that the defendant is not entitled to that defense.[27]  Specifically, the plaintiff "must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation."[28]  The issue of qualified immunity may be submitted to a jury only if "the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury."[29]  However, if the undisputed facts show that there was no constitutional violation, the plaintiff's claim "fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need

---

[24] *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006).

[25] *Jefferson v. Lewis*, 594 F.3d 454, 459-60 (6th Cir. 2010) (citations omitted).

[26] *Chappell v. City of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009) (citing *Pearson v. Callahan,* 129 S.Ct. 808, 815 (2009)).

[27] *Id.*

[28] *Id.*

[29] *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (citation omitted).

qualified immunity."[30]

Plaintiffs argue that Defendants' conduct violated their rights under the Fourth Amendment to the United States Constitution, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[31]  The Sixth Circuit has identified three types of permissible encounters between the police and citizens: (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.[32]  A consensual encounter does not amount to a seizure and, therefore, does not raise Fourth Amendment concerns.[33]  For example, police do not seize citizens "merely by approaching individuals on the street or in other public places and putting questions to them."[34]  A police encounter falls into the second category, investigative detentions, "when an officer restrains an individual's liberty by means of physical force or show of authority."[35]  "The Fourth Amendment permits an officer to stop and briefly detain an individual for an investigative purpose if the officer has a reasonable suspicion

---

[30] *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quotation omitted).

[31] U.S. Const. amend. IV.

[32] *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008) (citations and quotations omitted).

[33] *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005).

[34] *United States v. Williams*, 615 F.3d 657,663 (6th Cir. 2010) (quoting *United States v. Drayton,* 536 U.S. 194, 200 (2002)).

[35] *Bennett*, 410 F.3d at 821 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

supported by articulable facts that the individual is engaged in criminal activity."[36]  The Sixth Circuit

has adopted a two-part analysis for determining whether a *Terry* stop was justifiable.  First, the Court

must "determine whether there was a proper basis for the stop, which is judged by examining

whether the law enforcement officials were aware of specific and articulable facts giving rise to

reasonable suspicion."[37]  The Court looks to the totality of the circumstances, including the crime

level of the area itself, to analyze the reasonableness of the investigatory stop.[38]  Second, the Court

must decide "whether the degree of intrusion was reasonably related in scope to the situation at

hand," that is, the reasonableness of the police conduct given their suspicions and the surrounding

circumstances.[39]  The issue essentially becomes (1) whether the detention was sufficiently limited

in time and (2) whether the investigative means used the least intrusive means reasonably available.[40]

　　　With these principles in mind, the Court will consider each instance of allegedly

unconstitutional seizures.

**A.  April 19, 2006 Seizure of Amanda Dabbs**

　　　First, the parties dispute whether Amanda Dabbs and the minor Plaintiffs, C.B.D. and

M.D.D., suffered Fourth Amendment violations when a McNairy County sheriffs deputy and Bobby

Dabbs blocked their vehicle in a private driveway on April 19, 2006.  Plaintiffs argue that they were

---

[36] *Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 452 (6th Cir. 2006) (citing *Terry*, 392 U.S. at 30).

[37] *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009).

[38] *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

[39] *See*, 574 F.3d at 313 (quotations omitted).

[40] *Id*. (citation omitted).

unconstitutionally seized because the deputy and Mr. Dabbs blocked Amanda Dabbs' vehicle preventing her from leaving the driveway. Defendants argue that the deputy had reasonable suspicion to conduct a brief seizure.

The Court holds that Defendants are entitled to summary judgment as to this incident. As a threshold issue, Plaintiffs have alleged that Deputy Allen Strickland was the officer who blocked Ms. Dabbs' vehicle in a private driveway on this occasion, their only allegation against Deputy Strickland. And yet the parties have stipulated to the dismissal without prejudice of Plaintiffs' claims against Strickland, which would include their claims based on events of April 19, 2006. As such, Strickland is no longer a party to this suit and Plaintiffs' claim about the April 19 seizure is technically no longer before the Court. Even so, Defendants have apparently conceded that Deputy Bradley Smith, and not Strickland, was the officer who made contact with Ms. Dabbs on April 19, 2006. And yet Plaintiffs have not named Deputy Smith as a defendant in this matter and have otherwise taken no steps to amend their pleadings to add a claim against Deputy Smith. Neither party has addressed whether the substitution of Deputy Smith would be proper at this juncture of the case, especially whether the relation back requirements of Rule 15(c)(1) of the Federal Rules of Civil Procedure can be satisfied under the circumstances.[41] Therefore, strictly speaking, Plaintiffs have

---

[41] Rule 15(c)(1)(C) provides that

[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

no claim before the Court related to the events of April 19, 2006, whether against Deputy Strickland or Deputy Smith.

Even if Plaintiffs had sought leave to add Deputy Smith, the Court holds that Defendants are nevertheless entitled to summary judgment on the claim. In this case, Ms. Dabbs testified that she pulled her vehicle into a private driveway to turn around and head back in the direction of the City of Selmer to pay a bill that she had forgotten. When she put the car in reverse and began backing out, she was startled to look up and find that a police car had parked directly behind her in the driveway. Her estranged husband then parked the van that he was driving on the shoulder of the highway behind the police car. Ms. Dabbs stated that she rolled her car window down as the deputy approached. The deputy asked if she was Amanda Dabbs and if she was going to give her children to Mr. Dabbs. When she said no, the deputy responded that Mr. Dabbs "has papers saying that he's supposed to have them."

Two recent decisions from the Sixth Circuit have held that a person is seized within the meaning of the Fourth Amendment when a police officer positions his patrol car to block the citizen's vehicle and prevent her from leaving.[42] In both cases, the officer observed a suspicious looking vehicle parked in the parking lot of a high crime public housing complex. In *See*, the officer noticed the vehicle and "pulled his patrol car in front of See's car and parked the patrol car in front of See's car so that See could not move his vehicle."[43] Similarly, the very same police officer in *Gross* "parked his police vehicle directly behind the Oldsmobile and turned on his vehicle

---

[42] *United States v. Gross*, 662 F.3d 393, 399–400 (6th Cir. 2011); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009).

[43] *See*, 574 F.3d at 312.

spotlights."[44] He then approached the vehicle, introduced himself, and began asking Gross questions through the door that the suspect cracked.[45]  The Sixth Circuit held in both cases that the officer's act of blocking in the suspect's vehicle initiated a *Terry* stop, which required reasonable suspicion. "Given the fact that [the officer] blocked [the suspect's] car with his marked patrol car, a reasonable person in [the suspect's] position would not have felt free to leave."[46] Applying the same reasoning to the case at bar, the Court holds that because the patrol car parked directly behind Ms. Dabbs' vehicle and blocked her ability to exit the driveway, a reasonable person in Ms. Dabbs position would not have felt free to leave. [47]

Having concluded that the April 19, 2006 encounter was an investigative detention, the Court must determine whether the deputy had a constitutionally permissible basis for the detention.  "The police may conduct a limited investigatory detention of someone, falling short of arrest, if they reasonably suspect a person committed a crime."[48]  To justify such a stop, the police must have

---

[44] *Gross*, 662 F.3d at 396–97.

[45] *Id.* at 397.

[46] *See*, 574 F.3d at 313.

[47] In *O'Malley v. City of Flint*, 652 F.3d 662, 668–69 (6th Cir. 2011), the Sixth Circuit distinguished *See* and *Gross* in a case where a suspect pulled his car into a private driveway, exited the vehicle and walked toward the house.  The police officer then pulled into the driveway blocking the suspect's vehicle.  The court concluded that the facts of that case were factually distinguishable because "O'Malley not only reasonably thought he was free to leave his vehicle at the time of the alleged seizure, but in fact had left it and was walking away."  *Id.* at 669.  It also noted that "parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used."  *Id.*  The Court finds *O'Malley* distinguishable because Dabbs was backing her car out of the driveway, and not simply parking the vehicle, when she discovered the officer's presence.

[48] *Manley v. Paramount's Kings Island*, 299 F. App'x 524, 527 (6th Cir. 2008) (per curiam).

17

"specific, articulable facts" to support a "reasonable suspicion" that the suspect was engaged in criminal activity.[49]  Reasonableness is determined by two factors: (1) whether there was a proper basis for the stop and if so (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand.[50]

Based on the record before the Court, the Court holds that the deputy had reasonable suspicion to briefly detain Ms. Dabbs.  Defendants argue that the deputy had reasonable suspicion that Amanda Dabbs was in violation of Tennessee's custodial interference statute. Tenn. Code. Ann. § 39-13-306 makes it a class E felony for a parent to "[d]etain [a] child within this state . . . after the expiration of the noncustodial natural or adoptive parent or guardian's lawful visitation period, with the intent to violate . . . a temporary or permanent judgment or a court order regarding the custody or care of the child."[51]  Defendants contend that the deputy had reasonable suspicion based on a complaint Robert Dabbs had made to the sheriffs department earlier on April 19, 2006, as well as Ms. Dabbs' own admission that she knew her estranged husband was entitled to custody of the children that day.  According to an incident report dated April 19, 2006, Bobby Dabbs went to the McNairy County Justice Complex at approximately 9:40 a.m. to report that Ms. Dabbs was not allowing him to see their children in violation of his custody rights.[52]  Deputy Brad Smith reported

---

[49] *Gross*, 662 F.3d at 399 (quoting *Terry*, 392 U.S. at 21) (quotations omitted).

[50] *O'Malley*, 652 F.3d at 670 (quoting *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (quotations and ellipsis omitted)).

[51] Tenn. Code Ann. § 39-13-306(a)(2) & (e).

[52] *See* D.E. # 69-2.

that after looking for Ms. Dabbs at three locations, he spotted her traveling south on Highway 45 and pulled her over.[53] Deputy Smith's report states that he spoke with Ms. Dabbs, but she refused to turn over the children to her husband.[54] The report goes on to state that Deputy Smith advised Mr. Dabbs to contact his lawyer as soon as possible.[55] Additionally, Ms. Dabbs admitted in her deposition that the children were scheduled to be in the custody of Mr. Dabbs on April 19 pursuant to the temporary parenting plan.[56] Ms. Dabbs testified that she would not allow C.B.D. and M.D.D. to be with her estranged husband because she thought he was residing with his paramour, a violation of the parenting plan.[57]

The Court holds that the McNairy County Sheriffs Department had reasonable suspicion to stop Ms. Dabbs on April 19, 2006 to determine whether she was in violation of the custodial interference statute. There is evidence that Mr. Dabbs made an in-person report to the sheriffs department that Ms. Dabbs was violating his custodial rights to have their children on that date.[58] Deputy Smith parked his patrol car behind the Plaintiff, confirmed that the children were with her, and asked if she intended to give her children to Mr. Dabbs. When she refused, Smith stepped away

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Amanda Dabbs Dep. 130:4–132:10, Apr. 1, 2009.

[57] *Id.* at 132:17–133:3.

[58] *See Manley*, 299 F. App'x at 527 (victim's complaint and identification of suspect provided reasonable suspicion for *Terry* stop); *Williams v. Leatherwood*, 258 F. App'x 817, 821 (6th Cir. 2007) (citizen complaints of criminal activity and description of suspect and vehicle gave rise to reasonable suspicion).

and conversed with Bobby Dabbs.  Ms. Dabbs remained in her vehicle and rolled the window back up.  The deputy and Mr. Dabbs then left the scene.  Plaintiff admits that the deputy did not attempt to the take the children from her custody and did nothing more than ask if she intended to allow her husband to have the children.  Under the circumstances, the deputy's actions were "reasonably related in scope to the situation at hand," making the *Terry* stop lawful.[59]  Therefore, because the undisputed material facts surrounding the April 19, 2006 encounter establish that no Fourth Amendment violation occurred, Plaintiffs' Motion for Summary Judgment on this claim is **DENIED**.  Defendants' separate Motions for Summary Judgment are **GRANTED** as to this claim.

## B.  May 27, 2006 and May 31, 2006 Knocks at Amanda Dabbs' Residence

Next, the parties dispute whether Amanda Dabbs was unconstitutionally detained when Deputy Heathcock arrived at her residence on May 27, 2006, and again on May 31, 2006, and knocked at her front door.  Defendants seek summary judgment as to both incidents.  In both instances, Mr. Dabbs reported to the sheriffs department that his wife had failed to show up to exchange their children according to the parenting plan.  Deputy Heathcock responded by going to Ms. Dabbs' residence to speak with her.  On both days, Deputy Heathcock knocked on Dabbs' door and left when she refused to answer.  Defendants contend that these two incidents do not amount to Fourth Amendment violations because Deputy Heathcock never spoke with Dabbs, let alone seized her or detained her.  The Court notes that Plaintiffs have failed to respond to this portion of Defendants' Motion for Summary Judgment.

The Court holds that Deputy Heathcock's attempts to speak with Amanda Dabbs at her

_____

[59] *O'Malley*, 652 F.3d at 670.

residence do not constitute constitutional violations. A person is not "seized" for Fourth Amendment purposes merely because a police officer knocks on the door and asks the individual to talk.[60] The Supreme Court has held generally that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."[61] Furthermore, "[t]he fact that an encounter is initiated by police officers at the individual's home does not create a 'seizure' in what otherwise would be a consensual contact."[62] Dabbs was free to ignore Deputy Heathcock's requests to talk. In fact, that is precisely what she did by refusing to answer the door. In both instances, Deputy Heathcock simply left the residence when he received no answer. Accordingly, the Court concludes that these two encounters did not constitute "seizures." Therefore, Defendants' Motions for Summary Judgment as to these claims are **GRANTED**.

## C. May 31, 2006 Traffic Stop of Dale Monroe

Plaintiffs next claim that Deputy Heathcock's traffic stop of Plaintiff Dale Monroe later on May 31, 2006, violated the Fourth Amendment rights of Monroe and the minor Plaintiffs riding with him. The parties appear to agree that Deputy Heathcock "seized" Monroe, thereby implicating the Fourth Amendment. However, they disagree as to whether Deputy Heathcock had a constitutionally permissible basis for the stop, and both Plaintiffs and Defendants have moved for summary judgment on this issue. The Court previously analyzed this stop in its Order Granting in Part and Denying in

---

[60] *See United States v. Campbell,* 486 F.3d 949, 957 (6th Cir. 2007); *United States v. Nappier*, 155 F. App'x 859, 864 (6th Cir. 2005) ("[W]hen the officers went to the entrance of Nappier's residence, knocked on the door, waited for him to respond, and asked him to identify himself when he appeared, the officers were engaging Nappier in a consensual contact that did not implicate the Fourth Amendment.").

[61] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[62] *Nappier*, 155 F. App'x at 864.

Part Defendants' Motion for Summary Judgment (D.E. # 85) on August 5, 2008. The Court granted

summary judgment with regard to Defendants' removal of the children from Monroe's vehicle and

transfer to Mr. Dabbs, holding that

> [e]ven assuming that Deputy Heathcock misinterpreted the
> requirements of the parenting plan or that it did not grant him the
> authority to seize the Dabbs children, however, the Court cannot
> conclude that he was either plainly incompetent or that he knowingly
> violated the minor Plaintiffs' Fourth Amendment rights and is
> therefore not entitled to qualified immunity.[63]

The Court went on to hold that Defendants Chief Deputy Felker, Deputy Hurley, and Deputy

Crumby had no duty to intervene and were entitled to qualified immunity. However, the Court

denied Defendants' motion for summary judgment for initially seizing Monroe and the children

during the traffic stop. Thus, the remaining claim is Monroe's claim that Deputy Heathcock violated

his Fourth Amendment rights by stopping his vehicle on May 31, 2006, as well as the claims of the

minor children who were passengers in Monroe's truck.[64]

Plaintiffs now argue that summary judgment should be granted in their favor because the

warrant for Ms. Dabbs' arrest was invalid and Deputy Heathcock lacked articulable facts supporting

his belief that Dabbs was in Monroe's vehicle or reasonable suspicion that Dale Monroe was

engaged in criminal activity. For their part, Defendants contend that they are entitled to summary

judgment because (1) Deputy Heathcock had either probable cause or reasonable suspicion to suspect

that Amanda Dabbs was present in Monroe's vehicle at the time of the stop; (2) any defect in the

---

[63] Order Granting in Part and Denying in Part Defs.' Mot. Summ. J. 19, Aug. 8, 2008.

[64] *See Brendlin v. California*, 551 U.S. 249, 255-56 (2007) ("[A]lthough we have not, until today, squarely answered the question whether a passenger is also seized, we have said over and over in dicta that during a traffic stop an officer seizes everyone in the vehicle, not just the driver.").

warrant for Dabbs' arrest is immaterial because custodial interference is a Class E felony and no warrant was needed; and (3) the stop of Monroe only lasted a few minutes and any Fourth Amendment violation was *de minimis*. Defendants also contend that Deputy Heathcock is entitled to qualified immunity because his actions were objectively reasonable. Because the Court finds that the material facts underlying the May 31, 2006 stop are in dispute, summary judgment in favor of any party is not appropriate.

The Court finds that genuine issues of material fact exist as to whether Deputy Heathcock had reason to suspect that Ms. Dabbs would be in Monroe's vehicle. According to Defendants, Chief Burks gave Deputy Heathcock information that each time police officers left the Dabbs home, Monroe would pick up Ms. Dabbs and her children and Dabbs would hide in the vehicle to avoid detection. Chief Burks also allegedly gave Heathcock a description of Monroe's truck. Based on this information, Deputy Heathcock decided to conduct surveillance. When a vehicle matching the description of Monroe's truck came out of the street where Dabbs lived, Heathcock followed the truck and ran its tags to verify that it was Monroe's vehicle. Notably, Heathcock did not testify that he observed Amanda Dabbs or the minor children in the vehicle. Rather, Heathcock testified that he stopped Monroe because of the disputed tip. Defendants maintain that based on Chief Burks' tip and his own surveillance, Deputy Heathcock had reasonable suspicion to believe that Dabbs was in the truck and pull the vehicle over. However, Chief Burks has denied that he ever spoke to anyone, including Deputy Heathcock, about the Dabbs' or their family problems. Plaintiffs' argue that accepting Burks' denial as true, Deputy Heathcock lacked reasonable suspicion to detain Monroe. The Court agrees. Without the alleged tip from Chief Burks, Heathcock had no specific facts to indicate that Amanda Dabbs was a passenger in Monroe's truck at the time of the traffic stop. In

light of this factual dispute, the Court cannot rule as a matter of law on the issue of Deputy Heathcock's reasonable suspicion to stop and detain Monroe on May 31, 2006, and so the Court cannot reach the legal question of Deputy Heathcock's qualified immunity at the summary judgment stage.

Defendants raise the issue of whether a warrant for Amanda Dabbs' arrest was even needed. The Court finds that this issue is not dipositive at this stage in light of the disputed facts about Chief Burks' tip. The question before the Court is whether Deputy Heathcock had reasonable suspicion to detain Dale Monroe and the minors traveling in Monroe's vehicle. Even if Deputy Heathcock had probable cause to arrest Ms. Dabbs without a valid warrant (or even reasonable suspicion to detain her), he lacked any reasonable suspicion to detain Monroe. Assuming Chief Burks never gave him the tip, as Chief Burks claims, Deputy Heathcock had no basis to suspect that Ms. Dabbs was a passenger in Monroe's truck. Therefore, Defendants' contention about the necessity of a warrant is not dispositive.

The Court is likewise unpersuaded by Defendants' assertion that Monroe's constitutional deprivation was *de minimis*. Defendants rely on the Court's previous order in this case granting summary judgment in favor Selmer Police Officer Michael Gilbert.[65] There the Court held that Officer Gilbert's questioning and brief detention of Ms. Dabbs on May 31, 2006, was only a *de minimis* intrusion: "A law enforcement officer must have the latitude to stop someone who[m] he believes is the subject of an outstanding arrest warrant, even if that belief is mistaken."[66] The Court

---

[65] *See* Order Granting Mot. Summ. J. Defs. City of Selmer & Michael Gilbert, Nov. 6, 2007 (J. Todd) (D.E. # 51).

[66] *Id.* at 4.

finds the traffic stop involving Monroe entirely distinguishable. On the one hand, Officer Gilbert approached Dabbs with the mistaken belief that there was an outstanding warrant for her arrest. As soon as Gilbert resolved the question (apparently by calling Deputy Heathcock), Ms. Dabbs was free to go about her business. On the other hand, Deputy Heathcock had no reason to believe that Monroe was "the subject of an outstanding arrest warrant" or to suspect that Monroe was engaged in any illegal activity. There is no evidence that Deputy Heathcock detained Monroe because he suspected Monroe of engaging in illegal conduct. Instead, Heathcock only testified that he pulled Monroe over because he believed Amanda Dabbs would be in the truck, and the evidence that would support such a suspicion, the tip, is contested. Assuming for purposes of Defendants' Motion for Summary Judgment that Chief Burks did not give Heathcock the tip about Monroe, Heathcock had no information to suggest that Dabbs might be found in Monroe's truck and therefore no justification for detaining Monroe and the children. As a result, the Court rejects Defendants' contention that the stop constituted a *de minimis* infringement of the rights of Monroe and the children. The Court holds that triable issues remain as to the traffic stop involving Dale Monroe and the minor Plaintiffs. Therefore, both parties' Motions for Summary Judgment must be **DENIED** as to this claim.

**D. September 18, 2006 Stop of Amanda Dabbs**

The parties next move for summary judgment on the Plaintiffs' claim that Deputy Brown unconstitutionally seized Amanda Dabbs and M.D.D. on September 18, 2006. At issue is whether the exchange between Deputy Brown and Ms. Dabbs in the parking lot of the McNairy County Justice Complex was a consensual encounter or a seizure under the Fourth Amendment. The Court holds that the episode amounts only to a consensual encounter and thus no constitutional violation occurred.

As a preliminary issue, the Court highlights Judge Breen's previous ruling on this issue that questions of fact about the encounter precluded granting qualified immunity to Deputy Brown. The Court held, "Amanda Dabbs's version of the events, if true, may support a finding that Deputy Brown violated the Plaintiff's clearly established Fourth Amendment rights by engaging her in a (sic) unlawful traffic stop."[67] Specifically, Ms. Dabbs had provided an affidavit in which she stated that she refused to transfer custody of her daughter to Mr. Dabbs on September 18, 2006, because Pettigrew was present. Ms. Dabbs averred that after informing Mr. Dabbs that she did not intend to let him take their daughter, Ms. Dabbs "drove from the parking lot to the access road where I stopped for the stop sign."[68] At that point, Ms. Dabbs observed a police car pull behind her vehicle with its blue lights on "so I did not pull out into traffic."[69] Based on the affidavit, Judge Breen found that the evidence could be viewed to show that Deputy Brown "pulled her over after she had exited the parking lot, using his 'blue lights'", actions that if proven would make the event a *Terry* stop.[70] At that stage of the litigation, Defendants had no proof that Deputy Brown had any reasonable suspicion of illegal activity to justify a *Terry* stop. Therefore, Judge Breen denied Defendants' motion for summary judgment as to Deputy Brown's qualified immunity.

Since Judge Breen's ruling, Amanda Dabbs has given deposition testimony to elaborate on

---

[67] Order Granting in Part and Denying in Part Defs.' Mot. Summ. J. 15, Aug. 8, 2008.

[68] Amanda Dabbs Aff. ¶ 5 (D.E. # 70-2).

[69] *Id.*

[70] *Id.* at 14. The Court also rejected Defendants' contention that Deputy Brown had reason to suspect Ms. Dabbs based on previous complaints filed against her by Bobby Dabbs. *Id.* at 15.

the events of September 18, 2006. Ms. Dabbs testified that she agreed to the custody exchanges at the justice complex because she felt safer there.[71] According to Ms. Dabbs, after she spoke with Mr. Dabbs, she moved her vehicle from a parking space in the parking lot of the justice complex to the end of a road, which apparently adjoined the parking lot.[72] Contrary to her previous affidavit, however, Ms. Dabbs admitted that there was not a stop sign at the end of the road or that she had stopped her vehicle because of a stop sign.[73] Instead, Ms. Dabbs testified that she stopped her vehicle at that point because she was on the telephone with her attorney's paralegal seeking advice about the situation.[74] Ms. Dabbs explained that she "didn't want to totally leave the parking lot so that I didn't get into trouble - - you know, if I would get in trouble for leaving the parking lot."[75] Ms. Dabbs added that she sat in her vehicle "talking to [the paralegal] before [she] left the premises" and that the conversation continued there for at least five minutes.[76]

It was during her phone call to her attorney's office that Ms. Dabbs noticed a patrol car pull up behind her with its blue lights activated.[77] At that time, Deputy Brown left his vehicle and approached Ms. Dabbs' vehicle as she remained inside. Ms. Dabbs rolled her window down to speak to Deputy Brown who asked her whether she was going to allow her husband to take the

---

[71] Amanda Dabbs Dep. 416:18-24, June 28, 2010.

[72] *Id.* at 243:15-21.

[73] *Id.* at 243:22-244:12.

[74] *Id.* at 245:6-20.

[75] *Id.* at 245:9-13.

[76] *Id.* at 245:18-246:1.

[77] *Id.* at 246:8-24.

child.[78]  When Ms. Dabbs answered that she would not let her husband take the child, Deputy Brown

told her that Mr. Dabbs claimed to have married Pettigrew.[79]  Ms. Dabbs denied the claim because

the couple's divorce was not yet final.[80]  Deputy Brown then asked again whether Ms. Dabbs was

willing to give Mr. Dabbs the child, and she refused.  According to Ms. Dabbs, Deputy Brown

returned to his patrol car, and  Ms. Dabbs soon finished her conversation with her attorney's office

and left the scene.  Ms. Dabbs admitted that Deputy Brown never asked her to get out of the car or

informed her that she was not free to leave (although Ms. Dabbs stated that she did not feel free to

leave).[81]

Viewing this evidence in the light most favorable to Plaintiffs, the Court holds that under the

circumstances, Deputy Brown did not "seize" Ms. Dabbs for purposes of the Fourth Amendment.

Despite Plaintiffs' characterization of this event as an impermissible investigatory stop, the Court

holds that Deputy Brown's actions were consistent with a consensual encounter.  As the Court has

already observed, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition

of unreasonable seizures" by approaching individuals in public places and asking questions.[82]  A

consensual encounter only becomes a seizure for purposes of the Fourth Amendment when "in view

of all of the circumstances surrounding the incident, a reasonable person would have believed that

---

[78] *Id.* at 248:1-4.

[79] *Id.* at 248:5-8.

[80] *Id.* at 248:9-12.

[81] *Id.* at 250:1-4.

[82] *Gross*, 624 F.3d at 315 (quoting *United States v. Drayton,* 536 U.S. 194, 200 (2002)).

he was not free to leave."[83]   To make this determination, the Court must conduct a fact-specific inquiry to identify "coercive or  intimidating behavior which negates the reasonable belief that compliance is not compelled."[84]

In the case at bar, the Court previously denied Defendants' motion for summary judgment as to this incident and concluded that Deputy Brown was not entitled to qualified immunity.  Ms. Dabbs' earlier summary judgment affidavit could be read to describe a situation in which Deputy Brown initiated a *Terry* stop by activating his blue lights and keeping Ms. Dabbs' from leaving the scene.  Ms. Dabbs stated that she had stopped her car at a stop sign leaving the parking lot and that Deputy Brown had pulled up behind her, thereby preventing her from driving on.  That version of events, however, is fundamentally different than the account Ms. Dabbs gave in her June 2010 deposition.  Ms. Dabbs has now testified that she did not stop her vehicle because of a stop sign and even admitted that there was no stop sign where she pulled her vehicle over.  Ms. Dabbs' stated that she stopped to place a call to her attorney's office for legal advice about the ramifications of refusing to give her child to her husband.  Ms. Dabbs specifically stated that she did not intend "to totally leave the parking lot" until she could speak to her attorney's office and be sure that she would not "get into trouble."  Ms. Dabbs further testified that she remained parked and engaged in a conversation with her lawyer's paralegal for around five minutes before Deputy Brown ever contacted her.  In fact, Ms. Dabbs's phone call continued after Deputy Brown left, and as a result she stayed at the location for a brief while longer.

Because of Ms. Dabbs' stated intention not to leave the parking lot until she had obtained

---

[83] *Id*. (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)).

[84] *Id*. (quoting *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999)).

legal advice about her actions, it cannot be said that Deputy Brown in any way detained her or restricted her freedom of movement. Deputy Brown simply approached Ms. Dabbs where she was parked and engaged in a brief conversation. The Court holds that this amounted to no more than a consensual encounter. While there remains a dispute about whether Deputy Brown actually used his cruiser's blue lights, other courts including the Sixth Circuit have held that the use of police lights alone does not transform an otherwise consensual encounter into a seizure.[85] Moreover, there is nothing about the situation to indicate a typical "traffic stop" for the purpose of investigating a crime. Deputy Brown approached Ms. Dabbs to mediate the ongoing situation with her husband. According to Ms. Dabbs, Deputy Brown did not pose questions for the purpose of investigating a crime and never threatened any legal action against her. Most importantly, the undisputed evidence shows that Ms. Dabbs had no intention of leaving the parking lot until she had the legal advice she sought and even remained parked in the same location until her phone call was complete. To the extent that Ms. Dabbs did not feel free to leave, it was out of a reasonable apprehension over the uncertain consequences of her refusal to transfer her child, not the actions of Deputy Brown. Therefore,

---

[85] *E.g. United States v. Carr*, 355 F. App'x. 943, 946 (6th Cir. 2009) ("Another factor that may have some bearing on whether there was a *Terry* stop is that the police may not have left their emergency lights on during the encounter, but instead may have used those lights only to identify themselves."); *United States v. Garrett*, 106 F. App'x 423, 427-28 (6th Cir. 2004) (finding officer's approach with blue lights and his display of badge amounted to a consensual encounter). *See also United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) ("Lt. Gonzalez briefly flashed his blue lights, but only to identify himself as a police officer because he arrived at the scene in an unmarked car. Notably, at no point did Lt. Gonzalez block Valdez's truck or otherwise obstruct Perez, Valdez, or the others' exit from the area."); *United States v. Dockter,* 58 F.3d 1284, 1287 (8th Cir.1995) ("Deputy Meier pulled his vehicle behind their parked car and activated his amber warning lights" and "There was no behavior by the officer that would differentiate this encounter from one where an officer approaches a stranded motorist to offer assistance.").

Defendants' Motion for Summary Judgment is **GRANTED** as to this issue, and Plaintiffs' Motion must be **DENIED**.

### E. Claims Against Sheriff Roten in his Individual Capacity

Plaintiffs have alleged that Sheriff Roten failed to properly train or supervise the McNairy County Sheriffs deputies at all relevant times in this case. It is not clear to the Court whether Plaintiffs' claims against Sheriff Roten are strictly in his official capacity as McNairy County Sheriff or in both his individual and official capacities. Of course, any claims against a McNairy County employee in his official capacity, including Sheriff Roten, are simply claims against McNairy County itself.[86] Furthermore, the Court has granted Defendants summary judgment on all but one incident in this case, the detention of Dale Monroe and the minor Plaintiffs during the May 31, 2006 traffic stop. The Court has held that a dispute of material fact exists as to this event, and viewing the evidence in the light most favorable to Plaintiffs, Deputy Heathcock had no justification for stopping Monroe. Therefore, to the extent that Plaintiffs seek to hold Sheriff Roten liable in his individual capacity, Plaintiffs' only remaining claim against Sheriff Roten relates to this episode.

In order to prove a § 1983 claim against Sheriff Roten in his individual capacity, Plaintiffs must prove that Sheriff Roten was personally involved in the alleged deprivation of Plaintiffs' constitutional rights during the May 31, 2006 traffic stop.[87] Personal involvement amounts to "the

---

[86] *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) ("[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent.") (citing *Kentucky v. Graham,* 473 U.S. 159, 165 (1985)).

[87] *Miller v. Calhoun Cnty.,* 408 F.3d 803, 817 n.3 (6th Cir. 2005) ("Because § 1983 liability cannot be imposed under a theory of *respondeat superior,* proof of personal involvement is required for a supervisor to incur personal liability.").

supervisor encourag[ing] the specific incident of misconduct or in some other way directly participat[ing] in it" that is, the "supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."[88]  With respect to the traffic stop involving Dale Monroe, it is undisputed that Sheriff Roten was not on the scene of the stop or otherwise a direct participant in effectuating the stop itself.  Moreover, Plaintiffs have failed to point to any evidence that Sheriff Roten explicitly or implicitly authorized, approved or knowingly acquiesced in the traffic stop.  Therefore, Sheriff Roten is entitled to summary judgment on this claim.

The record shows that Sheriff Roten was aware of the custody dispute between Amanda and Robert Dabbs on May 31, 2006.  Deputy Heathcock has testified that on that day Sheriff Roten directed him to prepare a warrant for the arrest of Amanda Dabbs based on the charge of custodial interference.[89]  According to Deputy Heathcock, Robert Dabbs made a complaint with the sheriffs department earlier that day, alleging that Ms. Dabbs had failed to transfer their children to him as the parenting plan required.[90]  Sheriff Roten was present when Deputy Heathcock took the complaint and prepared the report.[91]  Deputy Heathcock testified that Sheriff Roten directed him to prepare an arrest warrant and go to Ms. Dabbs' residence with Mr. Dabbs so that he could see if she was willing

---

[88] *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984).

[89] Heathcock Dep. 109:12–22.

[90] *Id.* at 98:7–17.

[91] *Id*.

to give the children to her husband.[92]  After Deputy Heathcock filled out the warrant and affidavit but before he went to serve it on Ms. Dabbs, Sheriff Roten volunteered that he would personally take the warrant to the clerk's office and have it signed.[93]  Sheriff Roten testified that he received conflicting advice about bringing charges based on custodial interference and as a result never had the warrant issued.[94] It is undisputed then that the warrant was never signed, and without it the parties hotly contest whether Deputy Heathcock had any legitimate basis to arrest Amanda Dabbs.

The Court finds that it need not resolve the issue in order to determine Sheriff Roten's liability in his individual capacity.  Plaintiffs argue that the basis for their § 1983 claims against Sheriff Roten in his individual capacity is Roten's order to Heathcock to attempt to arrest Amanda Dabbs without a proper warrant.[95]  Plaintiffs ignore the fact that no McNairy County employee ever detained, let alone arrested, Ms. Dabbs as a result of Sheriff Roten's instructions.  Therefore, Amanda Dabbs never suffered a constitutional deprivation as a result of Sheriff Roten's alleged conduct.  For this reason alone, Sheriff Roten is entitled to summary judgment as to Plaintiffs' claims against him in his individual capacity.

Moreover, Plaintiffs have not attempted to show that Sheriff Roten directed Deputy

---

[92] *Id.* at 99:4–20.

[93] *Id.* at 110:1–8; 114:11–17.  Sheriff Roten testified that although he did not remember whether he told Heathcock he would have the warrant signed, he very well "could have." Roten Dep. 67:2–8, Aug. 24, 2010.

[94] Roten Dep. 67:10–22; 68:15–22.  Sheriff Roten stated that he contacted the attorney for McNairy County, the McNairy County district attorney, and a judge, asking all three for advice about the custodial interference law.  *Id.* at 68:17–22.

[95] Pls.' Resp. Opp'n Defs.' Mot. Summ J. 8 (D.E. # 135).

Heathcock to conduct a traffic stop and detain Dale Monroe. Sheriff Roten flatly denied that he instructed Deputy Heathcock to pull Monroe's vehicle over on May 31, 2006, or that he ever spoke to Heathcock at all about Monroe on that day.[96] Deputy Heathcock, on the other hand, claims that he called Sheriff Roten during the traffic stop to seek advice about Monroe's possible "grandparent rights." Even if Deputy Heathcock spoke to Sheriff Roten during the stop, there is no evidence that Heathcock discussed the validity of the traffic stop with Sheriff Roten. Indeed, Heathcock's seizure of Monroe and the alleged violation of Monroe's constitutional rights had already occurred. The fact remains that there is no evidence that Sheriff Roten had knowledge that the seizure was going to happen beforehand. Without some evidence that Sheriff Roten had prior notice of the traffic stop, Plaintiffs have failed to show that Sheriff Roten authorized or approved Heathcock's seizure of Dale Monroe on May 31, 2006.

Likewise, Plaintiffs have not argued that Sheriff Roten knowingly acquiesced in the alleged violation. Despite Plaintiffs' failure to make this argument, the Court finds that there is evidence in the record that on May 29, 2006, two days before the traffic stop, Monroe had met with Sheriff Roten to discuss the custody dispute between Amanda Dabbs and Robert Dabbs.[97] According to Monroe, he emphasized to Roten that he and his daughter mostly objected to Mr. Dabbs taking the children to stay in an apartment in Memphis where Dabbs lived with his girlfriend.[98] Sheriff Roten did not seem to be aware of this fact and simply stated, "All I know is this boy deserves to see his

---

[96] Roten Dep. 86:24–87:12; 88:21–89:3.

[97] Monroe Aff. ¶ 2 (D.E. #125-2).

[98] *Id.*

kids and if he doesn't get to see them, something is going to happen."[99] Monroe went on to aver that

right after the traffic stop, which occurred two days later on May 31, he telephoned Sheriff Roten

and told him what had happened, to which Sheriff Roten responded, "I know. I told you something

was going to happen if that boy didn't get to see his kids."[100] For his part, Sheriff Roten has stated

that he did have two telephone conversation with Monroe and that based on those conversations,

Roten investigated the incident and "concluded that the actions of Deputy Heathcock were those of

a reasonable and prudent officer. . . . ."[101] Roten does not specify what facts he obtained during his

investigation or how those facts would support Roten's belief that Heathcock acted properly. Based

on this evidence, a reasonable juror could conclude that Roten "acquiesced" in Heathcock's actions.

However, Plaintiffs' burden is not simply to show that Roten acquiesced to the traffic stop

but that Roten "knowingly acquiesced in the unconstitutional conduct of" Deputy Heathcock."[102]

The Court finds that Plaintiffs have failed to show that Roten also knew or should have known that

Heathcock's decision to stop Monroe amounted to a constitutional violation. As a result, Plaintiffs

cannot show that Roten knowingly acquiesced to a constitutional violation. As the Court has

highlighted previously, there is a factual dispute about whether Heathcock had reasonable suspicion

to believe that Amanda Dabbs would be found in Monroe's truck. Even if Plaintiffs could show that

Roten did not fault or discipline Heathcock for the traffic stop, Plaintiffs must also show that Roten

---

[99] *Id.*

[100] *Id.* at ¶ 4.

[101] Roten Aff. ¶¶ 20, 21 (D.E. # 123-9).

[102] *Bellamy*, 729 F.2d at 421.

knew that Heathcock's detention of Monroe rose to the level of a constitutional deprivation. For example, Plaintiffs might adduce evidence that Sheriff Roten knew Heathcock acted without a tip from Chief Burks and consequently had no reason to suspect that Amanda Dabbs would be in Monroe's truck. Viewing the record before the Court in the light most favorable to Plaintiffs, there is no proof that Sheriff Roten knew that Heathcock had stopped Monroe without reasonable suspicion and yet concluded that Heathcock acted properly anyway. Therefore, Plaintiffs have failed to show that Sheriff Roten knowingly acquiesced in a constitutional violation.

For these reasons, the Court concludes that Sheriff Roten had no personal involvement in conducting the allegedly improper traffic stop. Therefore, Defendants' Motion for Summary Judgment as to this claim against Sheriff Roten in his individual capacity is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED** as to this issue.

## F.  Conspiracy to Deprive Plaintiffs of their Constitutional Rights

Finally, Plaintiffs have alleged that Defendant Robert Dabbs conspired with other Defendants to violate Plaintiffs' constitutional rights by engaging in a pattern of harassment. All Defendants deny this allegation and move for summary judgment. Where a plaintiff claims cooperation or concerted action between state and private actors, the private actor "qualifies as a state actor and may be held liable pursuant to § 1983."[103] In order to hold a private person liable under § 1983, a plaintiff must prove that the private actor willfully participated in joint action with those acting under color

---

[103] *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (quoting *Cooper v. Parrish,* 203 F.3d 937, 952 n.2 (6th Cir. 2000)).

of law.[104] More specifically, a plaintiff must prove a § 1983 conspiracy by showing that (1) a single plan existed, (2) the conspirators shared a general conspiratorial objective to deprive the plaintiff of a constitutional right, and (3) an overt act was committed.[105]  The Sixth Circuit has defined a civil conspiracy as "an agreement between two or more persons to injure another by unlawful action."[106] The case law further recognizes that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire" and as a result "circumstantial evidence may provide adequate proof of conspiracy."[107]  Plaintiffs have the burden to come forward with "some evidence from which to infer that the defendants acted in concert" in their unlawful acts.[108]

Viewing the record in the light most favorable to Plaintiffs, the Court holds that Plaintiffs have not met their burden to adduce evidence, direct or circumstantial, of a conspiracy between Mr. Dabbs and any state actor.  The Court emphasizes that Plaintiffs' only triable claim for a constitutional deprivation is the May 31, 2006 traffic stop of Dale Monroe and the minor Plaintiffs. However, there is no evidence that Mr. Dabbs formed an agreement with Deputy Heathcock to detain Monroe or in any way directed Heathcock to make the traffic stop.  Heathcock became involved on

---

[104] *Id.* (citing *Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980); *United States v. Price,* 383 U.S. 787 (1966) (other citations omitted).

[105] *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (citations omitted).

[106] *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

[107] *Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 564–65, (6th Cir. 2010) (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

[108] *Id.* (quoting *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)).

May 31, 2006, only after Mr. Dabbs made a complaint to the sheriffs department about his custodial rights. It is clear that Mr. Dabbs involved the McNairy County Sheriffs Department on many occasions when he had a custody dispute with his estranged wife. There is no evidence, however, that Mr. Dabbs went to the sheriffs department because he had entered into a conspiracy with Deputy Heathcock, or any other officer, to harass Ms. Dabbs or Monroe. In fact, Mr. Dabbs' undisputed testimony was that he would make a report to the sheriffs department every time he did not get the children and believed he should have, just to document the event.[109] It is further undisputed that a friend who was also an attorney advised Mr. Dabbs to make these reports.[110] Even if there was proof that Mr. Dabbs was abusing the complaint process, the Sixth Circuit has held that a private party's misuse or abuse of presumptively valid state procedures does not constitute state action for purposes of a § 1983 conspiracy.[111] What is more, Ms. Dabbs has admitted that she had involved the authorities about custodial exchanges on other occasions.[112] The Court finds that this undisputed evidence does not give rise to any inference of a conspiratorial agreement between Robert Dabbs and any officer of the McNairy Sheriffs Department.

Furthermore, it is undisputed that on May 31, 2006, Deputy Heathcock went to Ms. Dabbs' home at the direction of Sheriff Roten, and not Robert Dabbs. Not only have Plaintiffs not contested

---

[109] Pls.' Resp. to Def. Dabbs' Statement of Undisputed Facts ¶ 9 (D.E. # 136-1) (citing Robert Corey Dabbs Dep. 104–105, Mar. 31, 2009).

[110] *Id.* (citing Dabbs Dep., 216–17 July 16, 2010).

[111] *Revis*, 489 F.3d at 291 (citing *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 941 (1982)).

[112] Pls.' Resp. to Def. Dabbs' Statement of Undisputed Facts ¶ 8.

this fact, but Plaintiffs have sought to hold Sheriff Roten liable for his instructions to Deputy Heathcock to go to the home and make contact with Amanda Dabbs. When Ms. Dabbs did not come to the door, Deputy Heathcock informed Mr. Dabbs that no one was home and apparently prepared to leave. It was at this point in the episode that Deputy Heathcock claims Chief Burks pulled up in his vehicle and offered the tip about Dale Monroe secreting Ms. Dabbs and the children away in order to avoid Mr. Dabbs, a claim Chief Burks now denies. According to Heathcock, he conducted surveillance and waited for Monroe because of the tip. In any event, even accepting that Deputy Heathcock did not have the tip from Chief Burks, the undisputed evidence shows that Heathcock engaged in the surveillance and waited to detain Monroe without the prior authorization or approval of Sheriff Roten or at the behest of Robert Dabbs. Heathcock testified that after he determined to wait for Monroe, he told Dabbs about his plan to conduct surveillance and to see if Amanda Dabbs would be traveling with Monroe.[113] The Court would highlight Heathcock's testimony that Dabbs asked to "hang around" and wait with Heathcock, and Heathcock responded that he did not have the authority to tell Dabbs to stay or to go.[114] Mr. Dabbs decided to drive to a nearby Wal-Mart store and wait in the parking lot.[115] Plaintiffs have not disputed this testimony, and the Court finds that nothing in this evidence supports an inference that Heathcock and Dabbs were acting in concert or as part of an agreement to deprive Plaintiffs of their constitutional rights. Based on the record before the Court, there is no evidence that Mr. Dabbs directed Heathcock or that Heathcock acted

---

[113] Heathcock Dep. 162:14–22.

[114] *Id.* at 162:20–22.

[115] *Id.* at 162:22-24.

pursuant to some agreement with Dabbs to improperly seize Dale Monroe and the minor children.

Plaintiffs claim that Mr. Dabbs has admitted "that he conspired by consenting to the taking of his children from someone rightfully entitled to have them."[116] Notably Plaintiffs have failed to specify where this "admission" appears in the record or how it would demonstrate their entitlement to relief as to the May 31, 2006 detention of Dale Monroe. The Court finds Plaintiffs' conclusory assertion to be without support. Viewing the evidence before the Court in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs' conspiracy claim is "insufficient to withstand a motion for summary judgment because they lack the requisite material facts and specificity necessary to sustain a conspiracy claim."[117] Therefore, Defendants' Motion for Summary Judgment as to the conspiracy claim is **GRANTED**, and Plaintiffs' Motion is **DENIED** as to this issue.

### III. Section 1983 Claims Against McNairy County

The Court holds that Defendant McNairy County is entitled to summary judgment on Plaintiffs' § 1983 claims against it. Plaintiff has alleged that the policy of Defendant McNairy County was the moving force behind the deprivation of their constitutional rights. As an initial matter, Defendant McNairy County is entitled to summary judgment as to the claims on which the Court has already granted summary judgment in favor of the individual Defendants. The Court has concluded that there are no triable issues of fact and that the individual Defendants are entitled to judgment as a matter of law with respect to the April 19, 2006 encounter; the May 27, 2006, and May 31, 2006 knocks at Amanda Dabbs' residence; and the September 18, 2006 encounter, all

---

[116] Pls.' Resp. Opp'n Def.'s Mot. Summ J. 7 (D.E. # 136).

[117] *Jackim*, 378 F. App'x at 564 (quotation and ellipsis omitted).

involving Plaintiff Amanda Dabbs.  Absent proof that an arrest or seizure violated a plaintiff's federal constitutional rights, there can be no local government liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).[118]  Therefore, Defendant McNairy County is entitled to summary judgment on these claims as well.

As previously noted, only Plaintiffs' claim related to the May 31, 2006 traffic stop of Dale Monroe and the minor Plaintiffs remains.  A plaintiff may not prevail against a municipality under § 1983 based solely on the conduct of a municipal employee such as a sheriffs deputy because "*respondeat superior* is not available as a theory of recovery under section 1983."[119]  In order to establish a claim against McNairy County, Plaintiffs must show that McNairy County acted with deliberate indifference to the risk of a constitutional deprivation and that the county's deliberate indifference was the moving force behind the deprivation.[120]  In other words, Plaintiffs must demonstrate that McNairy County "itself is the wrongdoer."[121]

In making this showing, a § 1983 plaintiff must identify a municipal policy or custom that

---

[118] *Wilson v. Morgan*, 477 F.3d 326, 344 (6th Cir. 2007). *See also Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006) ("Accordingly, whether it was the policy of the department not to stop drag races occurring in Detroit (as Jones claims) or whether state law prevented the department's intervention (as the City claims) makes no difference to the outcome of this dispute.  That the officers did not violate Denise Jones' constitutional rights eliminates any potential derivative liability of the City.").

[119] *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010) (citing *Monell*, 436 U.S. at 691).

[120] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–405, 411 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

[121] *Vereecke*, 609 F.3d at 403 (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996)).

was the moving force behind the plaintiff's injury.[122]  A municipal policy can be an "ordinance, regulation or decision officially promulgated by the [municipality's] officers."[123]  Unlike an official policy, a custom is a practice that "has not received formal approval through. . . official decisionmaking channels" but rather one "that policymaking officials knew about and acquiesced in."[124]  A "custom" for purposes of municipal liability must "be so permanent and well settled as to constitute a custom or usage with the force of law."[125]  Put another way, a "custom" is a "legal institution" not memorialized by written law.[126]

The Sixth Circuit has held that "the finding of a custom or policy is the initial determination to be made in any municipal liability claim."[127]  For purposes of § 1983, a municipal custom or policy must be shown by "a clear and persistent pattern"[128] of misconduct of any kind and cannot be based on "one instance of potential misconduct."[129]  The Supreme Court has required this higher

---

[122] *Id*. (citing *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005)).

[123] *Monell*, 436 U.S. at 690.

[124] *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell,* 436 U.S. at 690–91).

[125] *Porter v. City of Columbus Div. of Police*, 395 F. App'x 197, 203–204 (6th Cir. 2010) (citing *Monell,* 436 U.S. at 691, 98 S.Ct. 2018).

[126] *Doe*, 103 F.3d at 508 (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

[127] *Id*. at 509.

[128] *Id*. at 508.

[129] *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005).

standard in recognition of the fact that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident."[130]  Consistent with the deliberate indifference standard of fault, a plaintiff alleging local government liability for the deprivation of some right must show "a history of widespread abuse that has been ignored by the [local government]."[131]  The Sixth Circuit has explained that to impose municipal liability on lesser proof "would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard," a result "forbidden by the Supreme Court."[132]  This is particularly true where the claim is based on a failure to train.  The Supreme Court recently held "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," and so  "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference."[133]  In short, a § 1983 "plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference."[134]

---

[130] *City of Canton*, 489 U.S. at 392.

[131] *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton v. Harris,* 489 U.S. 378, 397 (1989)).

[132] *Thomas*, 398 F.3d at 432-33 ("[W]ithout showing more than officer Abernathy's potentially excessive use of force in this particular case, Thomas cannot survive summary judgment.") (citing *Monell*, 436 U.S. at 694; *Brown,* 520 U.S. at 410).

[133] *Connick v. Thompson*, 131 S. Ct. 1350, 1359–60 (2011).

[134] *Id*. at 433.

Applying these principles to Plaintiffs' claims, the Court finds that Plaintiffs failed to adduce any evidence that McNairy County's failures to train or supervise sheriffs deputies "were representative of a clear and persistent pattern" of deliberate indifference.[135] Plaintiffs argue in their memorandum that the proof "shows a pattern of constitutional violations by deputies of the McNairy County Sheriff's department and is proof of the lack of training and supervision of Sheriff Ricky Roten and McNairy County, Tennessee."[136] Plaintiffs, however, relied only on the "single instance" of their case "to infer a policy" of deliberate indifference. Plaintiffs never offered any proof of a "history of widespread abuse" or pattern of similar cases known to McNairy County that would constitute a policy or custom for purposes of § 1983. Having failed to introduce evidence from which the jury could find a local government policy or custom, Plaintiffs did not satisfy this essential element of their claims against the County.

It is true that Plaintiffs have alleged multiple constitutional violations committed by sheriffs deputies against them in this case. However, the Court has held that all of the individual Defendants, except Deputy Heathcock, were entitled to summary judgment. In Deputy Heathcock's case, Plaintiffs have only created a triable issue as to Heathcock's qualified immunity for the traffic stop involving Dale Monroe. This single incident is a far cry from a pattern or custom of constitutional infringements. Even if the Court had held that the individual Defendants were not entitled to summary judgment as to all of the other claims, Plaintiffs still had the burden "reach beyond the facts

---

[135] *Id*. (citing *Doe*, 103 F.3d at 508).

[136] Pls.' Mot. Summ J. 8, Apr. 30, 2011 (D.E. # 125).

of this case"[137] and show that McNairy County engaged in a "deliberate pattern" of failure to train or supervise in the face of similar complaints against other deputies under similar circumstances.[138] Viewing the evidence in the light most favorable to them, Plaintiffs proved at most that McNairy County was indifferent to Deputy Heathcock's improper traffic stop. However, this is "analytically distinct[]" from "having a 'policy' of always being deliberately indifferent to unconstitutional actions."[139] Plaintiffs' failure to demonstrate a municipal policy or custom is fatal to their claims against McNairy County. For this reason the Court holds that McNairy County is entitled to judgment as a matter of law on all of Plaintiffs' § 1983 claims. Therefore, Defendants' Motion for Summary Judgment as to McNairy County is **GRANTED**, and Plaintiffs' Motion is **DENIED** as to this issue.[140]

---

[137] *Thomas*, 398 F.3d at 434.

[138] *See Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007) ("[N]o reasonable juror could infer such a custom or policy based on a mere three instances [of police misconduct] that are limited to one police investigation."); *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006) ("To establish deliberate indifference through these reports [of sexual abuse], Pendergrass would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number."); *Doe,* 103 F.3d at 508 (no municipal liability where school board knew that teacher may have sexually abused students in the past and failed to remove him without proof of failures to take action against other teachers engaging in similar conduct).

[139] *Doe*, 103 F.3d at 508. *See also Brown*, 520 U.S. at 411, 117 S.Ct. 1382 ("But this showing of an instance of inadequate screening is not enough to establish 'deliberate indifference.' In layman's terms, inadequate screening of an applicant's record may reflect 'indifference' to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the *relevant* 'indifference.' A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.") (emphasis in original).

[140] Because the Court grants judgment as a matter of law to McNairy County, the Court need not address Defendants' argument that Plaintiffs cannot recover punitive damages against McNairy County.

## IV. Federal and Tennessee Kidnapping Statutes

Finally, Plaintiffs allege that the Defendants acted in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201.  All Defendants have moved for summary judgment as to any claims arising from this statute.  The Court holds that summary judgment is proper on these claims.  First, the Federal Kidnapping Act is a criminal statute, and there is no indication that Congress intended to create a private right of action for violations of its provisions.[141]  Moreover, even if a private remedy under the statute existed, there is no proof in the record to satisfy its essential elements.  The act requires that the person kidnapped be "[held] for ransom or reward or otherwise" and "willfully transported in interstate or foreign commerce."[142]  The Plaintiffs have presented no proof that C.B.D. and M.D.D. either were held for ransom or transported in interstate commerce.  Additionally, the statute does not apply to Robert Dabbs because it creates an exception "in the case of a minor by the parent thereof."[143]  Therefore, Defendants' Motions for Summary Judgment is **GRANTED** as to any cause of action based on the Federal Kidnapping Act.

Plaintiffs also allege that the conduct of all Defendants violated a litany of state laws, including statutory violations for kidnapping, aggravated kidnapping, especially aggravated kidnapping, false imprisonment, aiding and abetting custodial interference, assault, and aggravated

---

[141] *Giano v. Martino*, 673 F. Supp. 92, 95–96 (E.D.N.Y.) ("Federal Kidnapping Act was never intended to confer rights on the victim of a kidnapping, and does not do so by its language."), *aff'd*, 835 F.2d 1429 (2d Cir. 1987).

[142] 18 U.S.C. § 1201(a)(1).

[143] § 1201(a); *United States v. Boettcher*, 780 F.2d 435 (4th Cir. 1985) (discussing history of parent exception to § 1201(a)).

assault. Plaintiffs further allege claims for assault, battery, and aggravated assault. Defendants first argue that these statutes are criminal in nature and do not confer a private right of action on the Plaintiffs. In determining whether a statute creates a private right of action under Tennessee law, courts must decide whether the legislature intended to confer such a right by examining the express statutory language, statutory structure, and legislative history.[144] "The burden ultimately falls on the plaintiff to establish that a private right of action exists under the statute."[145] The Court concludes that like the Federal Kidnapping Act, these Tennessee statutes are criminal in nature, and Plaintiffs have failed to demonstrate that the Tennessee legislature intended to confer a private action for Defendants' alleged violations. Accordingly, any claims based on the cited Tennessee statutes must be dismissed. Therefore, Defendants' Motions for Summary Judgment are **GRANTED** as to these claims.

## V. Claims Under the Tennessee Constitution

Defendants have moved for summary judgment on Plaintiffs' various claims for violation of the Tennessee constitution. Although Plaintiffs have not responded to these issues in their briefing, Defendants correctly argue that there is no private cause of action against state actors for violations of the Tennessee Constitution.[146] Therefore, Defendants are entitled to summary judgment on Plaintiffs' claims for violations of the Tennessee Constitution.

---

[144] *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010).

[145] *Id.* at 856; *Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis*, 978 S.W.2d 91, 93 (Tenn. 1998); *Holt v. Macy's Retail Holdings, Inc.*, 719 F. Supp. 2d 903, 915 & n.17 (W.D. Tenn. 2010).

[146] *Cline v. Rogers*, 87 F.3d 176, 179–80 (6th Cir. 1996).

**VI. Common Law Tort Claims**

**A. Tort Claims Against the Individual Defendants and McNairy County**

With respect to Plaintiffs' common law tort claims against McNairy County and any of its employees, the claims are governed by the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-101 *et seq*. Section 29-20-201(a) provides that "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result" from the exercise of government duties.[147] The GTLA goes on to remove immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," unless an exception to the removal of immunity applies.[148] The Sixth Circuit has held that the GTLA's "civil rights" exception includes tort claims that "arise[ ] out of ... civil rights" violations such as 42 U.S.C. § 1983 cases.[149] As a result, the GTLA does not waive sovereign immunity as to negligent injuries arising from the violation of a plaintiff's civil rights.

Applying these principles to the case at bar, the Court concludes that Defendants are entitled to judgment as a matter of law on Plaintiffs' tort claims. The Court has already held that Plaintiffs' claims for damages based on violations of federal and state criminal statutes are not cognizable as civil claims. Though it is not clear to the Court that Plaintiffs have stated separate common law tort claims, the Court holds that the GTLA bars such claims against McNairy County and its employees. Plaintiffs' claims against McNairy County and the officers of its sheriffs department arise out of the

---

[147] Tenn. Code. Ann. § 29-20-101(a).

[148] § 29-20-205.

[149] *Johnson v. City of Memphis*, 617 F.3d 864, 871–72 (6th Cir. 2010) (construing the Tennessee GTLA civil rights exception).

48

same circumstances giving rise to their civil rights claim under § 1983 for violations of Plaintiffs' constitutional rights. The Court holds then that the GTLA's civil rights exception applies and that these Defendants are immune from suit. Therefore, Defendants' Motion for Summary Judgment as to these claims is **GRANTED**.

**B. Tort Claims Against Defendant Robert Dabbs**

Plaintiffs have also alleged claims sounding in tort against Defendant Robert Dabbs. Defendant Dabbs argues that Plaintiffs cannot prove their tort claims against him because there is no evidence that he personally engaged in any conduct injuring Plaintiffs such as an assault, false imprisonment or kidnapping. In their briefing on these claims, Plaintiffs explain, "The allegation [of false imprisonment and aggravated assault] against Robert Corey Dabbs stems from his actions of conspiring with those officers to harass Amanda Dabbs and her family concerning child custody in order for him to have visitation when he wanted it instead of when he was suppose to have it under color of law derived from the officers in this case."[150] Plaintiffs concede then that their theories of recovery are based only Mr. Dabbs alleged conspiracy with the other Defendants. The Court has already held that Plaintiffs have failed to adduce any evidence from which a reasonable juror could find that Mr. Dabbs conspired with any other Defendant to deprive Plaintiffs of a constitutional right. For the same reasons, the Court finds that there is no evidence that Dabbs conspired with any other Defendant to injure Plaintiffs by means of assault, false imprisonment, kidnapping, or any other tortious conduct. Therefore, the Court holds that Mr. Dabbs is entitled to judgment as a matter of law on these claims, and his Motion for Summary Judgment is **GRANTED**.

---

[150] Pls.' Resp. Opp'n Def.'s Mot. Summ J. 6–7 (D.E. # 136).

## CONCLUSION

Based on the parties' briefs and viewing the entire record of this case in the light most favorable to the non-moving parties, the Court holds that the only triable claim for a constitutional violation is the May 31, 2006 traffic stop of Dale Monroe and the minor Plaintiffs. Questions of fact remain about whether Deputy Heathcock had reasonable suspicion to pull over Monroe's truck in an effort to find Amanda Dabbs, thereby precluding summary judgment on this episode. Otherwise, Defendants are entitled to summary judgment on all of Plaintiffs other constitutional claims. The § 1983 claims of Plaintiff Amanda Dabbs in her individual capacity are therefore dismissed, and only the § 1983 claims of Dale Monroe and the claims on behalf of the minor Plaintiffs for the May 31, 2006 detention will go to the jury.

Additionally, Defendants are entitled to judgment as a matter of law as to Plaintiffs' § 1983 claims against Sheriff Roten in his individual capacity, the § 1983 conspiracy claims against Defendant Robert Dabbs, and the § 1983 claims against McNairy County. As for Plaintiffs' claims pursuant to the Federal Kidnapping Act, the Tennessee kidnapping statutes, and the Tennessee constitution, Defendants are also entitled to summary judgment. Finally, McNairy County and its employees retain sovereign immunity under the GTLA for any of Plaintiffs' claims sounding in tort, and Defendant Robert Dabbs is entitled to judgment as a matter of law as to Plaintiffs' claims that he conspired with McNairy County employees to engage in any tortious conduct.

Therefore, the Motion for Summary Judgment filed by Defendants McNairy County, Tennessee; Ricky Roten; Scott Heathcock; Allen Strickland; and Dustin Brown is **GRANTED IN PART, DENIED IN PART**. Plaintffs' Motion for Summary Judgment is also **GRANTED IN**

**PART, DENIED IN PART**.  Defendant Robert Corey Dabbs' Motion for Summary Judgment is

**GRANTED**.

    **IT IS SO ORDERED.**

                                   **s/ S. Thomas Anderson**
                                   S. THOMAS ANDERSON
                                   UNITED STATES DISTRICT JUDGE

                                   Date: February 6, 2012.